ROBERT TICKLE *v.* THE STATE.

1. INDICTMENT. — An indictment charging the infliction of a mortal wound, "of which mortal wound he, the said J. S., then and there languished, and afterwards, to wit, on the 10th day of March, 1876, languishing, died," sufficiently charges that the death proceeded from the wound.

2. JURY — OATH. — The jury oath, prescribed by art. 3029, Paschal's Digest, applies as well to capital as to other criminal cases.

3. CHARGE OF THE COURT — MANSLAUGHTER. — See opinion for a charge of the court on the law of manslaughter *held* to be erroneous, because likely to be understood by the jury as instructing them that an assault and battery on the defendant by the deceased could not constitute adequate cause unless it produced severe pain or bloodshed.

APPEAL from the District Court of Navarro. Tried below before the Hon. D. M. PRENDERGAST.

The defendant was indicted for the murder of James Shields, in Navarro County, Texas, on the fifth day of March, 1876. His trial resulted in his conviction of murder in the second degree, and his punishment was assessed at twenty-five years in the State penitentiary.

Ben Lancaster, an acquaintance of both the defendant and deceased, was the first witness introduced by the State. The defendant, deceased, witness (himself), and Sam Pedan were at a neighborhood church on the day of the homicide. Witness and Pedan had gone down to a branch, about three hundred yards distant from the church, and, on their return towards the church, met the defendant and the deceased. The deceased asked them to go back. They walked on behind the defendant and the deceased, and stopped on the bank of the branch, about twenty yards distant from them. The first thing witness heard was the deceased tell the defendant that he " didn't have a d—d thing to say about it," or something to that effect. Defendant attempted to draw a pistol, but deceased seized him by the collar, and said, " If you draw that thing on me, I'll kill you." Defendant then said, " I've got nothing." Deceased released him then, and slapped him as he did so. Defendant said, " Pshaw, Jim ; " stood still a moment, then stepped off four or five steps, turned, drew a pistol, and shot deceased in the side. Witness saw the handle of the pistol when defendant attempted to draw it.

Cross-examined, the witness said that himself and deceased were not more than neighbors and friends, but he thought the deceased liked him very much. The defendant commenced to draw the pistol as soon as deceased said that he " hadn't a d—d word to say about it," and the deceased collared him as soon as he commenced to draw. The deceased had a medium-sized pocket-knife — the one exhibited — in his hand, the large blade opened, when he collared the defendant. He held it near defendant's head, but made no effort or motion to use it. The deceased was mad when he had defendant collared, and the latter was frightened, and begging not to be killed. Pedan said, "Boys, this is no way to settle a difficulty ; " and defendant answered, " Mr. Pedan, I'll swear I havn't got a thing." The deceased then released him, slapping him as he did so. Wit-

ness thought the difficulty was then settled, until he saw defendant shoot deceased, which he did very suddenly.

Witness, cross-examined, stated that, at the request of Sheriff Johnson, the county attorney, and Mr. Shields, the deceased's father, he accepted a special deputation, and rode two days, in very bad weather, through to Hill County, to get the witness Wiley James, in order to secure a trial of this case at the first term of the court. When deceased slapped the defendant, the latter may have stepped back. The witness did not say, on a former examination, that he was forced back. The deceased lived twenty miles distant, and had not been in the neighborhood since the fourteenth day of February, 1876. Defendant lived within a mile and a half of Wake Forrest church, and frequently went there. Deceased was more slender than defendant, but otherwise they were about the same size.

Dr. Chamberlain testified that he waited on the deceased from the time he was shot until he died, and that he died from the effects of the shot, which passed through the stomach.

The testimony of Sam Pedan differs but little, and in no material degree, from that of Ben Lancaster. The first he heard of the difficulty, after getting to the bank of the branch, was Shields saying, "If you draw that thing on me, I'll kill you." Saw deceased rush up and collar defendant, drawing his knife, opened, out of his pocket, as he did so. When defendant was caught by deceased, he put his hand in his pocket; and when the latter drew his knife, he instantly commenced begging and trying to get loose. It was then that the witness said that is no way to settle a difficulty; and with that, as defendant said that he had nothing, the deceased released and slapped him.

Mr. Shields, father of the deceased, submitted a statement dictated by the deceased, and written by Dr. Bilbo, just before the death of the deceased, after he had been told that he could not live, and when he was conscious of

approaching death, clear of mind, etc.  The statement
reads : —

  " On the night of the 14th of February, I was at a party
at Mrs. Stroud's.  Bob Tickle came dancing around, and
came up to the fireplace.  I walked up behind him and
laid my hands on his shoulders, standing behind him, and
said, ' Bob, old fellow, take off your hat.'  He turned,
and looking at me, said, ' By G——d, I am going to keep it
on there.'  I said, ' It don't sound very gentlemanly to be
cursing in the house of nice folks.'  He said, 'Jim, just
walk out of the house and tell me that.'  He led the way,.
and I followed, until we got on the west edge of the hall.
He then stopped, and said, ' You have got all your friends
here.'  I said, ' Bob, I want you to behave yourself.'  He
then said, ' Then let us go out to the gate.'  He started to
pull out a pistol, and I told him not to draw a pistol on me.
He said, ' You have all your friends here ; I can't have any
show.'  I said, ' You can have as much show as any body,
if you will go back and behave yourself.'  I went back into
the house, and left him.  He stayed out of the house for
some time, and I heard him talking.  He then went off.  I
did not see Bob Tickle again until March 5.  First saw him
at a distance ; I was at Mrs. Stroud's, and he at Mrs.
Pierce's.  I did not see him any more for an hour or two.
I hitched up Mrs. Stroud's buggy, and took Miss Mattie
Stroud to preaching at Wake Forrest.  He was there, or
came soon after.  I walked out under some trees.  He took
Bob Pierce ten or fifteen steps to his horse, came back, and.
Bob [defendant] asked me to walk down to the branch with
him.  I started, and got about half-way, when we met Ben
Lancaster and Sam Pedan.  I said, ' Ben, don't you want
to walk back to the branch ? '  Ben said, ' Yes,' and he and
Pedan walked back.  Bob Tickle asked me if they were
coming, and I told him ' yes,' but did not take my eyes off
of him.  He said, ' Jim, I just want to have a talk with
you.'  I said, ' Bob, I don't want to have much talk with

you.'  He jumped back, and drew a pistol about half-way out of his pocket.  I grabbed the pistol, and drew my knife on him.  Pedan and Lancaster then interfered, and pulled us apart.  He said he did not have any pistol, and walked off five or six steps.  He turned around and shot me in the side, and I fell on my left side.  Ben Lancaster then run to me, but I said to him, 'Go and catch Bob.'  I then walked towards the school-house.  Then Mr. Buckenham and Mr. Pedan brought me down to Mr. Buckenham's house.  That is all.  Sworn to, etc.          J. N. SHIELDS."

James Hayden testified, for the State, that he was one of the congregation at Wake Forrest church on March 5, 1876, and saw both the defendant and deceased there that day.  The former reached there first, and was outside, in front of the church, when the latter came.  The deceased at first went into the church and took his seat.  He remained inside for a short time, but presently saw the defendant outside, and went out.  As he started out, some one said, " Jim, don't go out there;" but he went out where defendant was.  Witness then saw the defendant go behind the church and take some thing out of his coat-pocket, examine it, and put it in his pants pocket. Witness thinks it was a pistol.

One day, before the killing and after the party at Mrs. Stroud's on the 14th of February, defendant approached the witness while at work, and a conversation about the difficulty ensued.  During the progress of this conversation defendant said that the deceased need not think that he could " wag off" with that ; that there would be a " day of reckoning."

On cross-examination, the witness said that he was about thirty steps distant from the defendant when he saw him take out what he supposed to be a pistol.  Witness had formerly said that he thought he saw him revolving a pistol, but has since heard that it was a single-barrelled pistol which defendant had, and must, consequently, have

been mistaken. After defendant examined the pistol, witness saw no more of him until he and deceased were on their way to the branch. The defendant examined his pistol after the deceased went out of church. The witness will not swear that it was a pistol which he saw defendant take from his coat-pocket and examine, but thinks he saw the bulk of a pistol. Witness has been previously examined in this case, but said nothing about this, because he was not asked. Only one question was asked him on that examination.

The witness had heard of the difficulty between the defendant and the deceased at Mrs. Stroud's, and heard that defendant had to "back water" on that occasion. Witness does not remember whether he or defendant commenced the talk about the difficulty, when the latter came to see him, as stated above. When witness saw defendant examining the pistol behind the church, he was seated at a window on the north side of the church. Defendant and the window were both on that side which is towards the branch. The defendant was in plain view.

Henry, sworn for the State, testified that he saw the defendant when he came to the church. He hitched his little brown horse at the usual hitching-place, and, after walking a short distance towards the church, he returned to his horse and removed him five or more steps further from the church, in the direction of the branch, which located the horse about twenty-five steps from the church. There were other horses hitched there, but defendant's was the nearest one to the branch that witness noticed. Witness thinks that deceased was in the church at that time.

Thomas Buckingham testified that the deceased was shot on Sunday, and was taken to witness's house, where he died on the following Friday. Witness examined his pockets for a handkerchief, but found no weapons. Did not examine his pants pockets. The deceased made a dying statement, after being told by two physicians that he was going to

die. The witness understood that the family did not want him to know that he was going to die, and that the doctors differed as to the probability of death.

A. Luckey testified that he was at the party at Mrs. Stroud's, on the night of February 14th, and was sitting talking with the deceased, when the defendant came in and took his position by the fireplace, with his hat on. The deceased asked witness to "tell that fellow to take his hat off," which witness refused to do, as he did not think it was any of his business. The deceased then stepped up to the defendant and told him to take his hat off. The defendant answered, "My hat is on my head, and, by G—d, I won't take it off." Deceased said to him that no gentleman would wear his hat in the house where there were ladies. The defendant thereupon said, "You can't go out of doors and tell me that." He then walked out, and the deceased followed him. The witness followed to the gallery, and could see them in the front yard, but could not hear what was being said. The deceased presently came back into the house, and the defendant went off. Witness saw the defendant that night, after the occurrences described, at Mrs. Pierce's house. He said that he had been to several houses to get a gun, but failed. He did not mention the deceased's name, or make any threats. He remarked that Bill Black had an old pistol, but the mainspring was broken.

When the deceased spoke to the defendant about his hat, the latter was standing up quietly about the fireplace. The witness was at Mrs. Buckingham's the night deceased was shot, and sat up with him. During a conversation that ensued, the deceased said to witness, "Luckey, I advise you to avoid difficulties. If I had had nothing to do with Tickle at the party, I would not be in the fix I am now; I brought it all on myself."

Burdine Farmer, William Farmer, and Jim Hayden each testified that, on the night of the party at Mrs. Stroud's,

the defendant came to their separate houses and asked to borrow a gun, with which to go hunting.

Nat Curry, Milton Patterson, and Syd Tadlock each testified that, subsequent to the difficulty at Mrs. Stroud's, they heard the defendant say that he had an old six-shooter at home that he was going to break and wear out over the head of the deceased.

Ralley Dew, for the defence, testified that himself, defendant, and several other boys were squatted on the ground in front of Wake Forrest church, talking, when the deceased came out of the church and joined the crowd. He spoke to all of the crowd except the defendant and the witness, and took out his knife and went to whittling. When singing presently commenced in church, one of the two proposed to take a walk, and they went off towards the branch. Witness next saw defendant walking rather rapidly towards the church. Presently Lancaster came in sight, and hallooed, "Catch him; he has shot Shields." The defendant then struck a trot towards his horse, which was hitched at the usual place. The witness stepped towards him as he approached his horse, and noticed that his cheek was red, as though he had been struck by a stick. Witness did not see the defendant go behind the church, or leave the crowd at all, after the deceased came out of the church, until the two walked off together.

William Black testified that he saw the defendant at his father's house after the shooting, and he seemed to have been bruised about one cheek, and had a scratch across his throat, which appeared to have been made by a knife or brier.

Sam Pedan, introduced by the defence, remembered meeting William Black on Cedar Branch in the latter part of February, 1878, but did not remember what they talked about. Does not remember that he told Black about the fight, or that deceased said any thing when he slapped defendant. Thinks some thing was said, but does not remem-

ber what.   He did not think the defendant had any thing when he turned off, as witness had not yet seen the pistol.

William Black, referring to this meeting and conversation, testified that Pedan said that he had heard that the defendant had been caught, and that he was sorry for it, as he would have to go to court.   Pedan also told witness at that time that when deceased slapped defendant and turned him loose, he said, " You d—d cowardly son of a b—h, you won't fight nohow."   Henry Fuller and T. B. White were present.

T. B. White did not remember the words said by deceased at the time mentioned, as reported by Pedan, but they were very insulting.

Bob Pierce, who went to the church with the defendant, testified substantially as Ralley Dew, except that he said that himself and defendant went to their horses once after the deceased joined the crowd, to answer a call of nature. He also stated, in addition, that when deceased and defendant went off towards the branch, he saw the former place his hands under his coat, then pull them out, and put them in his pocket.   Is not certain that he and defendant went to their horses before or after deceased came out of church; it may have been before.

Mrs. Tickle, mother of the defendant, testified that when the latter came from church on the day of the shooting, about three hours by sun, his neck and his coat-collar were cut.   Blood had been oozing from the wound, and his cheek was bruised.

George W. Warren attended the party with the deceased, and, *en route*, saw him change a pistol from one to another pocket.   It was a " general party," or one to which all young gentlemen were at liberty to attend, and only ladies invited.

Wiley James related the occurrences at the party as detailed by the other witnesses, but adds that when the parties got outside of the house, and the defendant told the de-

ceased that he had the advantage of him, the deceased said, "Yes, and I will always have it." Other boys at the party had their hats on, but witness did not hear deceased request them to remove their hats.

W. J. Evans, Martin Scales, and A. S. Gill testified that the defendant's general reputation as a quiet, peaceable boy was good.

*Simkins & Simkins*, for the appellant. 1. The overruling of defendant's special exception to the indictment.

The part specially excepted to is as follows : "Giving to him, the said James Shields, one mortal wound in the belly of him, the said James Shields, of which mortal wound he, the said James Shields, then and there languished, and afterwards, to wit, on the 10th March, of A. D. 1876, languishing, died."

The exception to the indictment is, that it does not allege that Shields died of the wounds.

Appellant insists, first, that it is absolutely necessary that the indictment should allege that the party wounded died of the wound ; and, second, that this indictment does not so allege.

In support of the first proposition we refer to the old precedents : Arch. Cr. Pl. 314 ; Whart. Prec. of Indict. 73 ; 2 Hale's P. C. 186 ; 4 Texas Ct. App. 370.

"It must be averred," says Starkie, "that the wound was mortal, and the party died of the wound ; and this cannot be supplied by any implication or intendment whatever." Stark. on Cr. Pl. 93.

"In all cases the death by the means stated must be positively averred, and cannot be taken by implication." 1 East P. C. 343 ; 2 Arch. Cr. Pl. 207, notes 2, 3.

"When death arises from any wounding, the wound must be alleged to have been mortal ; nor is the latter word supplied by the allegation, which is at all times necessary, that the deceased died in consequence of the violence in-

flicted on him." 1 Chitty's Cr. Law, 243, 736 ; 2 Hawk. P. C., sect. 82, chap. 23.

"The death, by the means stated, must be positively alleged." *The State* v. *Wimberly*, 3 McCord, 190 ; 1 East P. C. 343 ; 1 Whart. Cr. Law, sect. 285. And last, in full accord with the above authorities, we cite the well-considered opinion of this honorable court in *Hardin* v. *The State*, 4 Texas Ct. App. 370, to the following affect : "It is necessary to allege and prove that the deceased died within a year and a day, of the wounds which occasioned the death."

It is also the first rule in criminal pleading that the indictment ought to be certain to every intent, without intendment to the contrary. 1 Chitty's Cr. Law, 172 ; 1 Arch. Cr. Pl. 88 ; 2 Hawk. P. C. 251 ; 2 Hale's P. C. 178 ; 1 Binney, 274 ; 3 Binney, 533 ; 8 Watts, 536.

Hence we conclude, in the language of the first proposition, that the indictment must allege "that the person wounded died of the wounds," without intendment to the contrary. Now, does the indictment in the case at bar charge and allege that James Shields died of the wound inflicted upon him, without intendment to the contrary?

We answer, it does not. It unquestionably alleges that James Shields received and languished of a mortal wound, on the 5th of March, 1876, in Navarro County, and that afterwards, on the 10th of March, languishing, he died. Now we insist that, whatever might be our opinion in the case or presumptions in the matter, the indictment certainly fails to allege that the wound which was the cause of the languishing on the 5th of March, 1876, was also the cause of the languishing on the 10th of March, or that it was the cause of death ; the idea is not negatived, of some supervening cause, which may have caused the languishing and death on the 10th of March. We freely admit that the fact of a person suffering and dying on the fifth day after receiving a mortal wound affords a strong presumption of

death resulting from the wound; yet, as shown above, the authorities are united in requiring that the pleader must absolutely state that the death was caused by the wound; and this court holds that in cases of murder the Code has not dispensed with the common-law requirements. *Hardin's Case*, 4 Texas Ct. App. 370. We are aware that it will be contended that the conjunction "and" carries over the phrase, "of which mortal wound," to "died;" but we insist that, whatever force this position may have had, if the verb "died" had been immediately connected with the word "languished" by "and," or had "languishing" been followed by "as aforesaid," or a previous continual languishing been alleged, from the day of stroke to the death, the indictment would certainly have been less liable to exception; but the absence of these essentials, and the introduction of the words, "and afterwards," certainly changes the entire sentence.

We well know that in *Harris's Case*, 2 Texas Ct. App. 106, based upon *Mayfield's Case*, 44 Texas 61, this court held that "and" carried over "then and there" to all material allegations. In the first place, Mayfield's case was an assault with intent to murder, and much less particularity is required in indictment for assaults with intent to commit a crime than for the crime itself. 15 Texas, 576; 35 Texas, 484. But, secondly, those were ordinary felonies; and such a rule does not apply to capital cases in Texas, where the requisites of a common-law indictment are still required. *Hardin's Case*, 4 Texas Ct. App. 370. What is the common-law doctrine? Where, in an indictment for murder, it was alleged that defendant "feloniously, and of his malice aforethought, made an assault, *and* with a sword *then and there* struck," etc. But see *Respublica* v. *Honeyman*, 2 Dall. 228. Upon the question whether "and" carried over the words "feloniously, and of his malice aforethought," the court held that the words *then and there* sufficiently applied them to the murder, because it shows

the assault and stroke were at the same time.  Chitty's Cr. Law, 221 ; 2 Dall. 228.  The simple use of " and," without " then and there," would have rendered the indictment fatal.  2 Hale's P. C. 179*.  In the case at bar, the death does not occur " then and there," but at a period subsequent, and therefore the greater necessity of allegations, not of time and place only, but of cause.

We here call the attention of the court to the fact that this question was raised by special exception to the indictment, and hence entitled to more consideration than in arrest of judgment.  *Williamson's Case*, 43 Texas, 501.

In obedience to the numerous suggestions of this court, we placed the finger of warning directly on the point, but the judge failed to see it.

2. It is further submitted that the conclusion which alleges that " James Tickle," him, the said James Shields, did then and there murder, vitiates the indictment.  The authorities say that the time and place first mentioned in an indictment are always referred to by the words " then and there."  1 Chitty's Cr. Law, 222 ; *Slack's Case*, 30 Texas, 353 (citing 4 Fost. 146 ; 2 Hale, 178).  If this be true, then the conclusion of this indictment alleges the murder to be committed on the 5th of March, whereas it also stated Shields died on the 10th of March.

Hawkins says, if the stroke is given on one day and he dies on another, it is error to charge murder on the day of the stroke.  2 Hawk. P. C., sect. 88, chap. 23 ; 3 Miss. 45 ; 39 Me. 291 ; 19 Pick. 124 ; 100 Mass. 12 ; 24 Miss. 358 ; Cro. Eliz. 739.

Again : if the stroke is alleged to be on the 10th of December, and the death afterwards, to wit, on the 20th of December following, and then it be alleged that defendant feloniously murdered deceased on the 10th of December, this vitiates the indictment, because the felony is not complete till the death occurs.  1 Chitty's Cr. Law, 222 ; 4 Co. 42 ; Bac. Abr., tit. "Indict," G ; Com. Dig., tit. "In-

dict," G, 4; 2 Hale's P. C. 188.    To the same effect is Co.
Inst. 53: "If a man be stricken 1st January and dieth
1st May, the year and the day shall be accounted after the
death, for *then* the man was murdered, and not *at the
stroke.*"

Lastly, we call attention to the fact that the indictment
fails to allege *where* the death occurred.

It is necessary, says Mr. Russell, to allege the time and
place of the wound, and of the death.    Russ. on Cr. 563; 2
Hale's P. C. 186, sect. 7.    These last two objections are
submitted under the doctrine that if the indictment is defec-
tive in substance, the conviction will be set aside though no
exception be taken or error assigned.    1 Texas Ct. App. 211.

There are two leading questions arising out of the evi-
dence, that should have been submitted to the jury.

1. As to the intent with which defendant began to draw
his pistol?    (Called by the court "the first hostile demon-
stration," in the charge.)    29 Texas, 494 (citing 3 Ired. 186).

Was it to kill Shields, in accordance with a formed design?
or was it a preparation for a "mutual combat," believed
by defendant "then and there to be imminent and inevi-
table?"

2. What was the cause of the shot?    Was it the fresh
provocation given the moment before the firing, or was it
done in accordance with a preconceived design?

And, in reference to the last question, we further sub
mit that the jury should have been duly instructed upon
the law of "fresh provocation."    They should have been
instructed that, where fresh provocation intervenes between
preconceived malice and the death-stroke, it must be shown
(it cannot be presumed) that the killing was an antecedent
malice.    *McCoy's Case*, 25 Texas, 42; *Murray's Case*, 1
Texas Ct. App. 421; 20 Texas, 530; 31 Texas, 574.

But his honor was silent as the grave on the question
of fresh provocation.    Does it need argument to demon-
strate that this silence of the court on one of the vital

points of the defence worked an injury against defendant? Nay, more ; his honor actually removed the question from the consideration of the jury by his charge, as follows : —

"If the defendant and the deceased were engaged in a quarrel, and the defendant commenced drawing a pistol before any hostile demonstration was made by deceased, the deceased then had the right to draw his knife and seize hold of defendant, in order to ' protect himself ; ' and these facts would not, under such circumstances, either justify or excuse the defendant in taking the life of the deceased."

Is this a fair charge? "These facts will not justify," says the court. What facts? Those enumerated in the charge, — deceased seizing defendant by the collar, and drawing a knife to protect ( ?) himself ! Why did the court stop short at " these facts," and assume that Tickle killed deceased because he caught hold of him to protect himself ?

We insist that this fourteenth section of the charge is a direct charge on the weight of evidence. It gathers up a portion of the core of the case, and says " these facts do not justify the killing." The court thereby abolishes the rest of the difficulty, and, in effect, says there was no face-slapping or cursing ; or, if there was, it was nothing. It was the ground of the defence, yet not worthy of a charge.

It is suggested that perchance his honor viewed the question from an eminently scriptural stand-point, and regarded it as not being an adequate cause in the matter, or worthy of being considered. Anyhow, he did not charge on it ; and this was error. Pasc. Dig., art. 3059 ; *Lister's Case*, 3 Texas Ct. App. 17 ; 40 Texas, 15 ; 27 Texas, 758.

But we object to this instruction on another serious ground : The court in it assumes that Tickle was going to kill Shields when he began to draw his pistol, for he says " that Shields had the right to seize Tickle and draw his knife, to protect himself." We insist that the purpose of Tickle in drawing the pistol should have been submitted to the jury. " Did Tickle draw to kill Shields, or because

he believed a combat was inevitable?" This was the issue. 44 Texas, 473; 2 Texas Ct. App. 450. And while the charge No. 14 may have been law had Shields killed Tickle, upon the doctrine of his right of self-defence against apparent danger, yet in the case at bar it could not be used against Tickle. There can be no presumption of law against defendant; but it should have been submitted to the jury. 41 Texas, 503.

Neither is the matter corrected by the converse of the charge. The attention of the jury is directed, not to the intent, but to the fact of drawing the pistol, and the defendant's justification is made to rest on whether it was first drawn before hostile demonstrations of deceased, or not. The charge, in both parts, assumes that if ithad been drawn it would have been instantly used to kill deceased; and which was a question for the jury. Besides, as a whole, this charge utterly excludes " fresh provocation " from the jury.

But we insist that the court erred in charge No. 19, and under the ruling of the Supreme Court in *Bishop's Case,* 43 Texas, 394.

In defining " adequate cause," the court, in addition to the statutory definition, saw fit to add to the statute, as follows : That the pain or bloodshed from an assault and battery must be severe to amount to " adequate cause." The effect of this charge, to a jury of ordinary comprehension, was that, unless the pain inflicted by the battery was severe physical pain, there could not be adequate cause. This charge, under the facts of the case, absolutely removed the question of " adequate cause " from the consideration of the jury. 2 Texas Ct. App. 497. We submit that a slap in the face may not produce severe physical pain, nor spitting in the face in public, nor shooting at and missing a person, nor in numerous cases that might be suggested; yet, under the definition as laid down by the District Court, none of these illustrations could be " adequate

cause." Yet, see 2 Texas Ct. App. 476, which recognizes the law, long before laid down, that the instances in the statute, of "adequate cause," are merely illustrative of what may legally render a mind incapable of cool reflection. In short, the adequacy of cause and the condition of the mind are always questions of fact for the jury. But here the court says unless the physical pain produced is severe, you must not regard it; thus again ruling out the idea of the insulting words and slapped face. And we ask attention to the energetic paraphrase of the statute by the court. The statute says "insulting words and gestures are not adequate cause;" but the court charges: "No words or gestures, *however insulting,* are adequate cause." In this case the defendant's face was, in the presence of by-standers, ignominiously slapped, with the expression, "Go, you d—d dog; you won't fight nohow!" or something like it. Its effect on him was instantaneous and evident; the shot is fired; death ensues. Yet the charge of the court, that no words, however insulting; and no battery, unless it produces *severe* pain; and no pain, unless it is *physical;* sweeps from the mind of the jury the most important scene in the bloody tragedy.

In *Dorsey's Case,* 34 Texas, 651, it was held to be error to instruct so as to preclude any part of defendant's testimony.

We submit that the observations of the Supreme Court in *Johnson's Case,* 43 Texas, 612, are applicable to the charges as given by the court below; for we think the opinion of the court below, as to the evidence, was plainly *visible* through his charges.

Again: we suggest error in the charge because the court instructs the jury that, before murder can be reduced to manslaughter, "adequate cause, *as above explained,*" — to wit, *severe pain,* — must exist. In the second part of this charge the court says: "If the defendant provoked the difficulty, or made the first hostile demonstration, with the apparent

intention of killing the deceased, the killing would not be manslaughter." By this charge the court left the jury free to understand that if the defendant only *provoked the difficulty*, and death ensued, it could not be manslaughter; whereas the statute (Pasc. Dig., art. 2260) says the difficulty must be provoked "with the apparent intent of killing." And neither is the alternative correct law, that "one who makes the first hostile demonstration, with the apparent intention to take life, cannot be guilty of manslaughter;" because the "first hostile demonstration, with apparent intent to kill," may be "provoked by insult," which can be well found by a jury to be "an adequate cause."

*Thomas Ball*, Assistant Attorney-General, for the State.

Ector, P. J.   The defendant was indicted in the District Court of Navarro County for the murder of James Shields. The trial resulted in a conviction of murder in the second degree.

In the view we take of this case, we do not propose to discuss all the errors assigned as grounds for the reversal of the judgment. Defendant excepts to the indictment, first, because it does not allege that James Shields died of the wounds received from, or inflicted by, the defendant; and, second, it does not allege that the said James Shields died of any wounds or injury inflicted by the defendant.

The indictment alleges that the defendant, on the fifth day of March, 1876, in the county of Navarro, and State of Texas, inflicted upon James Shields a mortal wound, "of which mortal wound he, the said James Shields, then and there languished, and afterwards, to wit, on the tenth day of March, 1876, languishing, died." This, we think, sufficiently charges that the death of Shields proceeded from the wounds.

The elaborate argument submitted by counsel for the defendant is sufficiently met by a simple reference to a case

in point.   In the case of *Lutz* v. *The Commonwealth*, 5
Casey, 441, where the allegation was that the prisoner
inflicted upon Richard O'Leary a mortal wound, of which
mortal wound he did languish, and languishing, did live ;
" on which said twenty-eighth day of June, in the year
aforesaid, the said O'Leary, in the county aforesaid, died."
This was held sufficient to show that the death proceeded
from the wound, and was sufficiently certain for an indict-
ment.   Cited in 2 Bishop's Cr. Proc. 530, note 31.

The record shows that the proper oath was administered
to the jury.   The jury-oath in a capital case, as well as in
all other criminal cases, is that prescribed in Paschal's
Digest, art. 3029.   *Clampitt* v. *The State*, 3 Texas Ct.
App. 638.

The learned judge who presided at the trial evidently
believed, under the facts testified to by the witnesses, that
the defendant was entitled to the benefit of a charge on the
law of manslaughter, and on this point instructed the jury as
follows :  " Manslaughter is voluntary homicide, committed
under the immediate influence of sudden passion, arising
from an adequate cause, but neither justified nor excused
by law.   By the expression, ' under the immediate influence
of sudden passion,' is meant that the provocation must arise
at the time of the killing, and that the passion is not the
result of a former provocation.   The act causing death
must be caused directly by the passion arising out of the
provocation then given, and it is not enough that the mind
is merely agitated by passion arising from some other or
previous provocation.   The passion here intended is either
of the emotions of the mind known as anger, rage, sudden
resentment, or terror, rendering the mind incapable of cool
reflection.   By the expression, ' adequate cause,' is meant
such as would commonly produce a degree of anger, rage,
resentment, or terror in a person of ordinary temper, suffi-
cient to render the mind incapable of cool reflection.

" 19. No words or gestures, however insulting, nor an

assault and battery so slight as to show no intention to immediately inflict pain or injury, will amount to adequate cause; but an assault and battery causing severe pain or bloodshed would be adequate cause."

The effect of the ninetenth subdivision of the charge of the court upon the minds of jurors of ordinary comprehension would be to create the impression that an assault and battery by the deceased upon the defendant would not be "adequate cause" unless it produced severe pain or bloodshed, when the law makes no such requirement, but says that an assault and battery "causing pain or bloodshed" would be adequate cause. The most natural and reasonable construction to be placed upon this portion of the charge would be that, as an assault and battery causing severe pain and bloodshed would be "adequate cause," the converse of the proposition would also be true, — i.e., that an assault and battery not producing severe pain or bloodshed would not be "adequate cause."

The charge of the court on the subject of manslaughter was calculated to mislead the jury; and for this error the judgment of the District Court is reversed and the cause remanded.

*Reversed and remanded.*